SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB #965128**
Scott.Kerin@usdoj.gov
**NICOLE M. BOCKELMAN, OSB #105934**
Nicole.Bockelman@usdoj.gov
**SARAH BARR, WSBA #40758**
Sarah.Barr@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:25-cr-00253-AB |
| **v.** | **GOVERNMENT'S TRIAL MEMORANDUM** |
| **HUGO GOMEZ-SOTO,** | |
| **Defendant.** | |

### INTRODUCTION

On December 29, 2023, defendant sold fentanyl to a young 29-year-old man (Adult Victim 1) who used it a day later and died as a result. On January 25, 2024, investigators, using Adult Victim 1's phone, texted defendant and arranged to buy more fentanyl. Defendant, not knowing that the victim had passed away, agreed to the deal, which was scheduled to occur near the victim's residence where he lived with his mother. When the defendant arrived at the location to complete the sale, he was arrested by the police. The defendant was in possession of

20 fentanyl pills (counterfeit M/30 pills manufactured with fentanyl) and two small baggies of fentanyl powder. After being taken into custody, the defendant was advised of his constitutional *Miranda* rights and interviewed. The defendant admitted to selling the victim fentanyl and that he also knew fentanyl was dangerous and can cause people to die.

Defendant faces a two-count indictment arising from his fentanyl trafficking, which includes causing the fentanyl overdose death of Adult Victim 1. The charges are:

Count 1: Distribution of Fentanyl Resulting in Death of Adult Victim 1, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C);

Count 2: Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C);

ECF No. 3.

The pretrial conference is set for March 30, 2026, with a five-day jury trial starting on April 6, 2026. The government is ready for trial.

## FACTUAL BACKGROUND

### I. Defendant and Adult Victim 1 Communicate to Coordinate Fentanyl Sales

Adult Victim 1, a 29-year-old, employed, young man, struggled in an ongoing battle with fentanyl addiction. In the last month of his life, Adult Victim 1 purchased, on average, $60 worth of fentanyl powder and $20 worth of fentanyl pills every 2 to 4 days from the defendant.

At the end of November 2023, the defendant received Adult Victim 1's contact information as a potential client. Prior to purchasing fentanyl from defendant, Adult Victim 1 bought fentanyl from a person that he knew as "Antonio," who was using the account wilverhernandez11211W@icloud.com. Through analysis of Adult Victim 1's phone and additional investigation, law enforcement learned that "Antonio" was Wuilver Hernandez-Rivas.

On November 29, 2023, "Antonio" sent Adult Victim 1 a message which stated, "Hello friend, I am the person who takes care of you. I was deported to my country but I have my cousin. He can take care of you anyway. If you want." That "cousin" was the defendant. Adult Victim 1 replied that he was wondering what happened and then he asked for the "cousin's" phone number. While Adult Victim 1 had previous sources of supply, during the month leading up to his death, records show that the defendant became Adult Victim 1's source of fentanyl.

Text messages show that the defendant and Adult Victim 1 first began communicating on November 29, 2023, and that these communications began with a text message from defendant to Adult Victim 1 which read, "Hi, Antonio gave me your number. I'm his cousin."



On November 30, 2023, defendant first sold fentanyl to Adult Victim 1. Following that initial deal, the defendant sold fentanyl to Adult Victim 1 nine times between December 7, 2023, and December 29, 2023. The last drug deal occurred at approximately 8:28 p.m. on December 29, 2023. According to the text message communications between defendant and Adult Victim 1, the majority of the drug sales between defendant and Adult Victim 1 occurred in the evening near the victim's residence.

## II.     On December 29, 2023, Adult Victim 1 Purchased Fentanyl from Defendant

On December 29, 2023, per phone records, Adult Victim 1 contacted defendant at approximately 8:28 p.m. to purchase "20 blue and 90 powder" ($20 worth of fentanyl pills and $90 worth of fentanyl powder) (the screen shot from Adult Victim 1's phone is below).



**III.    On December 30, 2023, Adult Victim 1 Dies from a Fentanyl Overdose**

Adult Victim 1 struggled with drug addiction and had been smoking fentanyl for the past year, a battle his mother witnessed firsthand. Adult Victim 1 lived with his mother, a registered nurse. She knew her son was struggling and tried to provide a loving place for him to be in an effort to help him with his addiction. She knew her son used fentanyl before work and would smoke fentanyl in the garden shed that was in their backyard.

Adult Victim 1's mother will testify that on December 30, 2023, the day after he had last purchased fentanyl from defendant, her son went outside to the garden shed at approximately 11:00 a.m. to smoke fentanyl. She remembers her son coming back into the kitchen and after taking a few steps into the house he collapsed. She immediately started life saving efforts, including giving her son multiple doses of Narcan, and calling 911. While her son was dying on her kitchen floor, she desperately tried to save his life by performing CPR on him. When the paramedics arrived, they took over the efforts to save his life.

Adult Victim 1 was transported to Oregon Health and Science University (OHSU) for medical treatment. At OHSU, Adult Victim 1 was taken to the Emergency Department where he received testing and emergency treatment in an effort to save his life. Doctors noted that defendant appeared to be in cardiac arrest upon arrival. Medical personnel applied chest compressions and administered Narcan and epinephrine, in addition to other emergency life-saving treatment. At 1:03 p.m., despite their best efforts, Adult Victim 1 was eventually declared deceased.

**IV.    Portland Police Involvement**

Police did not initially respond to the scene. On January 23, 2024, Portland Police contacted the victim's mother and interviewed her. According to the Adult Victim 1's mother,

when Adult Victim 1 came back into his house and collapsed, he had a small container with fentanyl pills and powder on him. His mother collected this and provided it to the police during their visit. The police also collected Adult Victim 1's cellphone as evidence. The police sent the seized container containing suspected fentanyl to the Oregon State Police (OSP) lab which tested the pills and powder taken from the victim and confirmed the pills and powder contained fentanyl. The contents of Adult Victim 1's cellphone was copied and downloaded as well.

**V.      Investigators Set Up a Buy with Defendant**

On January 25, 2024, Portland Police Bureau (PPB) Officer Randy Castaneda, posing as Adult Victim 1, used Adult Victim 1's phone to send a series of text messages to the defendant's phone requesting to purchase "80 powder and 20 blue." The defendant, at this time, was unaware that Adult Victim 1 had died. Defendant agreed to the sale and agreed to meet near Adult Victim 1's house. This time, however, it was the police who were waiting for the defendant to arrive. When the defendant arrived to complete the deal, he texted that he was "here" and that he was in a "Ford funsion." (see below).

///

///

///



Police found defendant sitting in a Ford Fusion while he waited for Adult Victim 1. The police moved in and arrested the defendant. After the defendant was arrested the police called the number they texted to set up the deal and defendant's cellphone rang and the name "Yordan" appeared on the screen, which was a very slight difference from Adut Victim 1's first name. The defendant was searched and found in possession of 20 blue fentanyl pills and two small baggies of fentanyl powder, approximately 80 dollars worth. The pills and powder found on defendant were sent to the Oregon State Police lab and were confirmed to contain fentanyl.

**Government's Trial Memorandum** **Page 7**

The officers advised defendant of his constitutional *Miranda* rights, in Spanish, and defendant confirmed he understood his rights. Officers also asked defendant for consent to search his vehicle, which he gave. Defendant had $551.00 cash in his wallet. Police collected defendant's cellphone from the vehicle. After the case was adopted for federal prosecution, the case agent applied for and received a federal search warrant for the defendant's phone, but due to it being password protected they have been unable to get into it and search it.

The defendant was subsequently interviewed, in Spanish by a Spanish speaking Officer. The defendant told police that he would regularly meet Adult Victim 1 near Adult Victim 1's house and do deals with Adult Victim 1, who would arrive on foot. Defendant said that his sales with Adult Victim 1 were usually at night and that Adult Victim 1 always wore a hoodie and had his hood up during his sales. Police showed defendant some of the text messages exchanged between defendant and Adult Victim 1. Defendant said that he received Adult Victim 1's phone number, as well as three to four other customers, from Antonio. Defendant said he did not know Antonio's location. Defendant confirmed that he was the only person who used his cellphone. He also confirmed that he was the one who exchanged the text messages with Adult Victim 1, including confirming the drug sales in the days leading up to Adult Victim 1's death. Defendant also explained that he sold "blues" and small one (1) to two (2) gram baggies of fentanyl powder. Defendant said that he got the fentanyl from someone on the street and that he is fronted the fentanyl and pays his source back after he sells the drugs. Police told defendant that Adult Victim 1 died from a fentanyl overdose. At this point, defendant then shook his head and said, "oh yeah? Oh no, oh no." Defendant told police that, as far as he knew, he has not sold fentanyl

///

to anyone that overdosed in the past.  Defendant did acknowledge that he knew fentanyl is dangerous and that it can cause people to die.

**VI.      Oregon State Lab Confirmation of Fentanyl**

The pills and powder seized from the defendant were tested by Forensic Scientist Jonathan Dyer, of the Oregon State Police Forensic Laboratory, and confirmed to contain fentanyl.  Mr. Dyer's report and notes have been provided in discovery.  Mr. Dyer's qualifications and anticipated testimony has been provided in the Government's Expert Notice.

The pills and powder that Adult Victim 1 possessed when he died were tested by Forensic Scientist Ngan Vo, of the Oregon State Police Forensic Laboratory, and confirmed to contain fentanyl.  Ms. Vo's report and notes have been provided in discovery.  Ms. Vo's qualifications and anticipated testimony has been provided in the Government's Expert Notice.

**VII.      Cause of Death**

On December 31, 2023, Dr. Nicole Stanley with the Oregon State Medical Examiner's Office performed an external examination of Adult Victim 1.  She did not perform an autopsy. Femoral blood was also drawn from the victim and submitted for analysis.  After receiving the blood toxicology report completed by Oregon State Police Forensic Laboratory Forensic Scientist Shelli Martinez and based upon the totality of the circumstances surrounding his death, Dr. Stanley concluded that Adult Victim 1's cause of death was "fentanyl toxicity."  Dr. Stanley's qualifications and anticipated testimony has been provided in the Government's Expert Notice.

Forensic Scientist Shelli Martinez will also testify that she analyzed the victim's femoral blood and that the victim had more than 100 ng/mL of fentanyl within his blood, as well as 53

ng/mL of Norfentanyl, Acetaminophen, and 4-ANPP.  She will testify that this level of fentanyl is death inducing.  Ms. Martinez's qualifications and anticipated testimony has been provided in the Government's Expert Notice.

**LEGAL DISCUSSION**

**I.  Elements of the Offenses**

Defendant is charged by indictment in two Counts: Count 1 alleges Distribution of Fentanyl Resulting in Death, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C), and Count 2 alleges Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C).

> **A.  Count 1:  Distribution of Fentanyl Resulting in Death (21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C))**

The elements of Count 1 are:

First, on or about December 29, 2023, within the District of Oregon, the defendant knowingly and intentionally distributed fentanyl; and,

Second, the defendant knew that it was fentanyl or some other federally controlled substance.

Because the government has alleged a sentencing enhancement in Count 1, to-wit, that death resulted from the defendant's distribution of fentanyl, if the Jury finds the defendant guilty of distributing fentanyl, they must then determine whether Adult Victim 1's death was a result of the fentanyl distributed by defendant.

To prove that the fentanyl distributed by the defendant "resulted in" his victim's death or serious bodily injury, the government can prove either that the drug was independently sufficient to do so, or that it was the but-for cause of the death or serious bodily injury.  *See Burrage v.*

*United States*, 571 U.S. 204, 218-19 (2014). A particular drug is the but-for cause if it was a necessary factor—not merely a contributing factor—in producing the harm. In other words, but for the victim's use of the distributed Fentanyl, he would not have died. *Id.* at 211-12.

As noted below, the current Ninth Circuit Model Jury Instruction only encompasses the "but-for" prong of causation discussed in *Burrage* and not the "independently sufficient" prong as well. The Ninth Circuit Jury Instruction does not fully encompass what *Burrage* and subsequent courts have held. Pursuant to *Burrage*, the government can prove that the fentanyl distributed by the defendant resulted in death or serious bodily injury by showing either that the drug was independently sufficient to cause death or serious bodily injury or that it was the but-for cause of death or serious bodily injury. The government has proposed a modified jury instruction to reflect this.

**B. Count 2: Possession with Intent to Distribute Fentanyl (21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C))**

The elements of Count 2 are the following:

First, the defendant knowingly possessed a mixture and substance containing a detectable amount of Fentanyl; and,

Second, the defendant possessed it with the intent to distribute it to another person. Model Jury Instr. for the Ninth Circuit, § 12.1 (2024) (modified).

**II. Witnesses and Exhibits**

The government plans to call approximately 20 witnesses. The government filed Expert Notice for 11 of the witnesses in a separate filing. ECF 41. The government is planning to offer approximately 53 exhibits in the form of medical reports, photographs, lab reports, and an audio

///

**Government's Trial Memorandum** **Page 11**

recording. Those numbers may change based on stipulations, defense arguments, and pretrial rulings.

Simultaneous with the filling of this trial memorandum, the government is filing a witness list naming trial witnesses as:

- Adult Victim 1's mother who will describe Adult Victim 1, his fentanyl use, and the events of the morning of December 30, 2023;

- Adam Pestillo and Chad Hedrick, the AMR paramedics who arrived at Adult Victim 1's home to provide emergency treatment;

- Dr. Jordan Wackett, Dr. Manuel Gonzalez-Gonzalez, and R.N. Sharon Caddy who will explain their evaluation, treatment and ultimate diagnosis of Adult Victim 1 while he was at OHSU;

- Portland Police Bureau Officers Ryan Derry and Josh Sparks who will explain locating fentanyl and defendant's phone;

- Portland Police Bureau Officer Stephen Le who will explain the Cellebrite extractions of Adult Victim 1's phone;

- Portland Police Bureau Detective Mike Jones who will explain his initial investigation;

- Portland Police Bureau Detective Travis Law will explain his follow up investigation and review of Adult Victim 1's phone;

- Portland Police Bureau Officer Randy Casteneda will explain using Adult Victim 1's phone to contact the defendant, defendant's text messages, the arrest of defendant, and defendant's statements;

- Oregon State Forensic Laboratory Forensic Scientists Jon Dyer and Ngan Vo, who will explain the testing and analysis of the fentanyl powder and pills found both on defendant and those that were possessed by Adult Victim 1 on December 30, 2023;

- Oregon State Forensic Laboratory Forensic Scientist Shelli Martinez who will testify about her analysis of Adult Victim 1's femoral blood and her conclusions;

- Medical Investigator Kate Makkai who will discuss her investigation of Adult Victim 1's death; and,

- Dr. Nicole Stanley who will explain the examination of Adult Victim 1, review of toxicology reports, and her medical conclusion that Adult Victim 1's cause of death was "fentanyl toxicity."

## III. Stipulations

As of the date of this filing, the defense has not agreed to any stipulations.

## IV. Evidentiary and Legal Issues

### A. Defendant's Statements and Adult Victim 1's Statements in Text Message Communications

The government will introduce text message communications between defendant and Adult Victim 1 through Detective Travis Law. The statements made by defendant are admissions by a party and are non-hearsay under Rule 801(d)(2)(A). Defendant's text messages are admissible for their truth. Adult Victim 1's death makes him unavailable. Fed. R. Evid. 803(a)(4). The text messages showing Adult Victim 1 requesting to purchase illegal drugs are statements made against Adult Victim 1's penal interest. Fed. R. Evid. 804(b)(3)(A) (acknowledging trustworthiness of statements that "expose the declarant to criminal liability").

Corroborating evidence indicates the trustworthiness of AV-1's statement. Fed. R. Evid. 804(b)(3)(B).

Adult Victim 1's statements are also admissible through the residual exception of Federal Rule of Evidence 807 (FRE 807). FRE 807 provides that a statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

As discussed above, Adult Victim 1's text communications with defendant have sufficient guarantees of trustworthiness, due to the corroborating evidence. Adult Victim 1's text messages are corroborated through the defendant's text message replies, the fentanyl that was found on Adult Victim 1 and in his home, as well as the text messages that were later exchanged using Adult Victim 1's phone and defendant's post-arrest statements described below. Further, the statement is more probative on the point for which it is offered than any other evidence that can be obtained through reasonable efforts.

The government will also introduce statements (text messages) made by defendant to Adult Victim 1 's phone, while Officer Randy Casteneda was posing as Adult Victim 1 and ordering fentanyl from defendant. The government will introduce those statements through Officer Randy Castaneda. Rule 801(d)(2)(A).

///

**B.      Summary Exhibits**

Defendant conducted his sales with Adult Victim 1 from November 30, 2023, until December 29, 2023.  On average, Defendant and Adult Victim 1 communicated to arrange fentanyl sales every 2 to 5 days throughout December 2023.  The government produced the full cellphone downloads of victim's phone and the Cellebrite extraction.  The records will be admitted and are admissible as party admissions as explained above.  Rule 801(d)(2)(A).

Given the voluminous nature of the cellphone downloads, they "cannot be conveniently examined in court."  The government is preparing a timeline summary of the text communications between defendant and Adult Victim 1 from November 30, 2023, until December 29, 2023.  The summary will be offered to prove their content and are admissible. Fed. R. Evid. 1006; *United States v. Johnson*, 594 F.2d 1253, 1257 (9th Cir. 1979).

The government intends to use a timeline during opening statements as a demonstrative aid and plans to use the exhibit during closing argument.

**C.      Defendant's Post-Arrest Statements**

After his arrest and *Miranda* advisal, defendant told interviewing officers that he would meet Adult Victim 1 near Adult Victim 1's house.  Defendant said that Adult Victim 1 always wore a hoodie with the hood up and that it was usually dark when they did their deals.  The information provided by defendant was corroborated by text communication showing that defendant and Adult Victim 1 agreed to drug sales at night close in proximity to Adult Victim 1's home.

Defendant told police he received Adult Victim 1's contact information from "Antonio" and that defendant did not know where Antonio was.  Defendant said that defendant was the only

person using the cellphone number that made the fentanyl deals through text message communication with Adult Victim 1. Defendant told police that he remembered sending specific text messages regarding quantities of fentanyl that he sold, and he told police that he sells "blues" and small one (1) to two (2) gram baggies of fentanyl powder and that he knows that fentanyl is dangerous and can cause people to die. These opposing party statements are admissible non-hearsay when offered against the defendant. Fed. R. Evid. 801(d)(2).

### D. Prior Conviction

If the defendant testifies at trial, the government will seek to impeach him with the evidence of his 2009 prior felony conviction of Manufacture/Delivery of a Schedule I/ II Controlled Substance under Washington State Statute 69.50.401(2)(A). Under Fed. R. Evid. 609(a), evidence of prior felony convictions is admissible if the court determines that their probative value outweighs their prejudicial effect. *United States v. Martinez-Martinez*, 369 F.3d 1076, 1088 (9th Cir. 2004).

Federal Rule of Evidence 609 provides in pertinent part that for the purpose of attacking the credibility of a witness, evidence that an accused is convicted of a crime punishable by death or imprisonment in excess of one year shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect. In this case, evidence of defendant's prior conviction of Delivery of a Controlled Substance is more probative than prejudicial when reviewing the impeachment value of the crime, the date of the prior conviction in relation to defendant's criminal history, the similarity of the prior conviction to the underlying case and the level of importance of defendant's testimony in the underlying case. *U.S. v. Alexander,* 48 F.3d 1477 (9th Cir. 1995).

Should the government be allowed to use the defendant's prior felony conviction to impeach him, an appropriate limiting instruction regarding the use of the prior conviction should be given to the jury.

### E.     F.R.E. 702: Expert Witnesses

The government intends to offer approximately 11 expert witnesses.  This number may be decreased depending on potential stipulations (*e.g.*, drug identification and quantity) or increased based upon defendant's trial submissions.  Federal Rule of Evidence 702 provides that "if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert "may testify thereto." F.R.E. 702.

In this case, defendant is charged with selling fentanyl to Adult Victim 1 which resulted in his death.  This offense involves medical testing, treatment, diagnosis of Adult Victim 1 as well as the post-mortem forensic examination of Adult Victim 1 and the testing of the fentanyl that was found on Adult Victim 1 and defendant.  Witnesses with expertise in medical treatment, forensic science, and toxicology will aid the jury in its understanding of the evidence.  The government has filed expert witness notice consistent with the Court's standing pretrial order.

OSP Medical Examiner Nicole Stanley will testify as to Adult Victim 1's cause of death. Blood and urine samples from Adult Victim 1 were sent to the OSP Laboratory for analysis. These samples were also analyzed by Shelli Martinez.  PPB conducted an undercover buy of fentanyl from defendant.  The contents of the fentanyl received from defendant were sent to the OSP Laboratory for analysis where they were analyzed by Forensic Scientist Jonathan Dyer. The fentanyl Adult Victim 1 possessed at the time of his death was also sent to the OSP Laboratory and analyzed by Forensic Scientist Ngan Vo.

In addition to the experts involved in the treatment of Adult Victim 1, the forensic examination of Adult Victim 1's blood and urine, and the analysis of the fentanyl seized in this case, the government anticipates calling Special Agent Bobby Gutierrez to provide testimony related to his specialized knowledge regarding fentanyl use and sales, specifically, he will testify about the manner in which fentanyl users purchase quantities of fentanyl to maintain a functional level of stability, their patterns of fentanyl use, the terms used to refer to fentanyl, and the process of buying fentanyl on the street. Portland Police Detective Travis Law, if needed, is also prepared to testify about the street-level sales and use of fentanyl, to include the terms used to refer to fentanyl and the prices of fentanyl.

Reports and findings by the experts were provided to defendant in discovery. Curricula Vitae, of the expert witnesses who have them, have also been provided to defendant.

F.      **Government's Requested *Burrage* Jury Instruction**

Federal law provides for enhanced penalties where a defendant manufactures, distributes, dispenses, or possesses with the intent to manufacture, a Schedule I or II controlled substance and "death or serious bodily injury results from the use" of the controlled substance. 21 U.S.C. § 841(a)(1) and 841(b)(1)(C). The determination of whether death resulted from the use of the controlled substance is a question for the jury to decide.

In *Burrage v. United States,* 571 U.S. 204 (2014), the Supreme Court addressed the meaning of the phrase "death or serious bodily injury results from the use of such substance," found in 21 U.S.C. § 841(b)(l)(C), and the appropriate standard of causation to attach liability for a defendant's actions. In doing so, the Court stated:

> We hold that, at least where use of the drug distributed by the defendant is not an **independently sufficient** cause of the victim's death or serious

bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a **but-for** cause of the death or injury.

Id. at 218-19 (emphasis added).

Thus, to prove that the fentanyl distributed by the defendant "resulted in" his victim's death or serious bodily injury, the government can prove either that the drug was independently sufficient to do so, or that it was the but-for cause of the death or serious bodily injury.

The current Ninth Circuit Model Jury Instruction, however, only covers the "but-for" prong of *Burrage.* It provides:

> If you find that the defendant is guilty of distributing fentanyl, then you must determine whether [Adult Victim 1's] death was a result of the fentanyl distributed by defendant.
>
> If you find that the defendant is guilty of distributing fentanyl, then you must determine whether [Adult Victim 1's] death was a result of the use of the fentanyl distributed by the defendant. To find that the use of a drug resulted in death, you must unanimously and beyond a reasonable doubt find that "but for" the use of the fentanyl that the defendant distributed, Adult Victim 1, would not have died.
>
> To find a particular controlled substance distributed by the defendant was a "but for" cause of death, you must find beyond a reasonable doubt that, but for the decedent's use of the fentanyl, the decedent would not have died.
>
> The government does not have the burden of establishing that the defendant intended that death result from the use of fentanyl. Nor does the government have the burden of establishing that the defendant knew, or should have known, that death would result from the use of the fentanyl that the defendant distributed.

Ninth Circuit Model Jury Instruction 12.4 (emphasis/highlighting added).


///

///

The government has proposed that the highlighted section of the Model Jury Instructions, noted above, be modified to account for both causation prongs of *Burrage*, and that the Court instruct the jury that:

> To find that a drug resulted in death, you must unanimously and beyond a reasonable doubt find either that the fentanyl was **independently sufficient** to cause Adult Victim 1's death, regardless of his use of any other controlled substances, or that it was a necessary factor – not merely a contributing factor – in causing his death. The fentanyl is a necessary factor if, **but for** Adult Victim 1's use of the drug, he would not have died.

The government's modified instruction follows the language of *Burrage* and subsequent cases that, in determining whether the fentanyl distributed by the defendant resulted in Adult Victim 1's death, asks the jury to decide whether the fentanyl distributed by the defendant was either "independently sufficient" to cause death or the "but-for" cause of death. The "independently sufficient" and "but-for" instruction proposed above was given in March 2023, by U.S. District Judge Michael Mosman in *United States v. Koffie*, Case No. 3:17-cr-00291-MO (ER 294).

Courts across the country, including here within the Ninth Circuit, have repeatedly held that the jury can find that death or serious bodily injury resulted from the use of a controlled substance where the drug was **either independently sufficient** to cause death **or** serious bodily injury, **or** that it was the **but-for cause** of death or serious bodily injury. *See, e.g. United States v. Robinson*, 55 F.4th 390, 401 (4th Cir. 2022) ("In other words, the government can prove that 'death result[ed] from a drug in one of two ways. . . [i]t can prove 'but-for' causation . . . [o]r it can prove that the drug was an independently sufficient cause of the victim's death . . . ."); *United States v. Broeker*, 27 F.4th 1331, 1336 (8th Cir. 2022) (testimony from doctor satisfied both prongs of *Burrage* – the fentanyl in victim's system, even with the presence of other drugs,

was both the but-for cause of death, the amount was also independently sufficient to result in death); *United States v. Morgan*, 2022 WL 17348115, * 3 (8th Cir. 2022) ("a jury could find beyond a reasonable doubt that fentanyl was the but-for cause or an independently sufficient cause of [victim's] death."); *United States v. Assfy*, 2021 WL 2935359, *5 (6th Cir. July 13, 2021) ("the government must show that the distribution was 'either an independent, sufficient cause of the victim's death or a but-for cause.'"); *United States v. Myers*, 965 F.3d 933, 937-8 (8th Cir. 2020) ("The government can prove the causation element in two ways: '(1) but-for cause or (2) independently sufficient cause.'"); *United States v. Feldman*, 936 F.3d 1288, 1314 (11th Cir. 2019) (multiple drugs being present in the victim's system does not matter so long as the government can prove the drugs defendant sold were the but-for cause of death or independently sufficient to cause death); *United States v. Seals*, 915 F.3d 1203, 1206 (8th Cir. 2019) ("there was ample evidence that the heroin was either a but-for cause or an independently sufficient cause of the overdose" that resulted in serious bodily injury); *United States v. Spayd*, 2023 WL 2890715, *4 (D. Alaska April 23, 2023) (Government may prove that death resulted from the use of the drug by showing it was the but-for cause of death or an independently sufficient cause of the death); *United States v. Ducasse*, 2019 WL 5058583, * 4 (D. Alaska 2019) ("In *Burrage*, the Supreme Court held that the drugs distributed by a defendant must be an 'independently sufficient cause of the victim's death or serious bodily injury' or a 'but-for cause of the death or injury' to establish liability under 21 U.S.C. § 841(b)(1)(C)."); *Mendez v. Swain,* 2019 WL 4740539, * 2 (C.D. Calif. 2019) ("In *Burrage*, the Supreme Court held that for a defendant to be liable under the 'death results' enhancement provision of § 841(b)(1)(C), the use of the drug distributed by the defendant must either be an independently sufficient cause of death

or serious bodily injury, or must be a but-for cause of the death or injury."); *Terry v. Shartle*, 2017 WL 2240970, *6 (D. Ariz. 2017) ("In *Burrage* the Supreme Court held that to prove a violation of § 841(b)(1)(C), the government had to prove to a jury beyond a reasonable doubt that the drug distributed was either 'an independently sufficient cause of the victim's death' or the 'but for' cause of death."); *United States v. Snider*, 180 F.Supp. 3d 780, 794 (D. Or. 2016) (in which U.S. District Court Judge Michael Simon held that "*Burrage* left open the possibility that a defendant may be guilty under 21 U.S.C. § 841(b)(1)(C) when use of a drug distributed by the defendant is one of several sufficient causes of death. The Court is not aware of any Ninth Circuit case to the contrary. Because Snider distributed cocaine that was independently sufficient to kill Mr. Crow, Snider violated 21 U.S.C. § 841(b)(1)(C).").

The current Ninth Circuit Model Jury Instruction only encompasses the "but-for" prong of causation discussed in *Burrage* and not the "independently sufficient" prong as well. The Ninth Circuit Jury Instruction thus does not fully encompass what *Burrage* and subsequent courts have held. Pursuant to *Burrage* and the cases cited above, the government can prove that the fentanyl distributed by the defendant resulted in death or serious bodily injury by showing either that the drug was independently sufficient to cause death or serious bodily injury or that it was the but-for cause of death or serious bodily injury. The government has proposed a modified jury instruction to reflect this.

## V.     Forfeiture

The indictment contains a general drug forfeiture allegation under Title 21, United States Code, Section 853. Arresting officers seized the following items from defendant that are subject to forfeiture: $551.00 in U.S. currency representing the amounts of proceeds obtained as a result

of the offense.  The government has reached out to defense counsel, but defense counsel has not

agreed to bifurcate the forfeiture trial and allow the Court to decide the issue.  We will continue

to try and resolve this issue prior to trial.

DATED: March 2, 2026.                           Respectfully submitted,

                                                SCOTT E. BRADFORD
                                                United States Attorney

                                                /s/ *Scott Kerin*

                                                SCOTT M. KERIN, OSB #965128
                                                Assistant United States Attorney

                                                /s/ *Nicole Bockelman*

                                                NICOLE M. BOCKELMAN, OSB #105934
                                                Assistant United States Attorney

                                                /s/ *Sarah Barr*

                                                SARAH BARR, WSBA #40758
                                                Assistant United States Attorney